# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 03-245 |
| | ) | Judge Nora Barry Fischer |
| FREDERICK H. BANKS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

I.  INTRODUCTION

Presently before the Court is a Petition on Supervised Release ("Petition") filed by the U.S. Probation Office against *pro se* Defendant Frederick H. Banks on October 24, 2013 alleging that he committed the federal crimes of wire fraud and aggravated identity theft while on supervised release in this case.[1] (Docket No. [537]). The allegations in the Petition are identical to another Petition filed against Defendant Banks at Criminal Number 04-176. After holding contested violation proceedings, during which Banks waived his right to counsel and represented himself, Chief Judge Joy Flowers Conti found that Defendant Banks violated the conditions of supervised release by committing wire fraud and aggravated identity theft and sentenced him to 14 months' incarceration and 6 months' supervised release, to be served in community confinement, such as the Renewal Center, Inc. *See United States v. Banks*, Crim. No. 04-176, Docket No. 715 (W.D. Pa. Nov. 26, 2013). Chief Judge Conti's decisions were affirmed on appeal by the United States Court of Appeals for the Third Circuit. (*See id.* at Docket No. 801). At a status conference/violation hearing held on October 28, 2014, Defendant Banks and the Government entered into a series of agreements, including that the Court should determine whether he violated the conditions of his release as set forth in the Petition by reviewing the

---

[1] At a status conference/hearing held on October 28, 2014, the Court granted the Government's oral motion to dismiss the Supplemental Petition filed by the U.S. Probation Office.

1

record of the proceedings before Chief Judge Joy Flowers Conti in Criminal No. 04-176, the transcripts of which were admitted into evidence in this case, without objection by Defendant Banks. (Govt Exs. 1, 2, 3). After careful consideration of the record in Criminal Number 04-176 and for the following reasons, the Court finds that the Government has demonstrated by a preponderance of the evidence that Defendant Banks committed a Grade "B" violation as alleged in the Petition.

## II. FINDINGS OF FACT

### A. Procedural History

On October 15, 2004, a federal jury convicted Defendant Banks of all seven counts of the Second Superseding Indictment at Criminal Number 03-245, including charges of: mail fraud (Counts 1-3); criminal copyright infringement (Count 4); money laundering (Count 5); uttering and possession of a counterfeit or forged security (Count 6); and witness tampering (Count 7). (Docket No. 93). Defendant Banks was sentenced by the Honorable Thomas M. Hardiman on February 25, 2005 to a total sentence of 60 months' incarceration to be followed by 36 months' of supervised release with standard and additional conditions. (Docket No. 207). Relevant here, Defendant Banks was subject to the standard condition that he "shall not commit another federal, state or local crime while on supervised release." (*Id.* at 4). After serving a consecutive sentence of 63 months' incarceration imposed by now Chief Judge Conti at Criminal No. 04-176, Defendant Banks was released from custody to supervision of the U.S. Probation Office on May 24, 2013. (Docket No. 537).

The U.S. Probation Office charges that Defendant Banks committed the federal offenses of wire fraud in violation of 18 U.S.C. § 1343 and aggravated identity theft in violation of 18 U.S.C. § 1028A while on supervised release. (Docket No. 937). As noted, Chief Judge Conti

held an evidentiary hearing over several sessions, after which she concluded that the Government proved by a preponderance of the evidence that Defendant Banks committed the crimes, revoked his supervised release and sentenced him to 14 months' incarceration, followed by 6 months' supervised release to be served in community confinement. (Govt. Exs. 1-3). The United States Court of Appeals for the Third Circuit affirmed. This Court stayed the proceedings in this case until the conclusion of Defendant Banks' appeal and then lifted the stay during the hearing/status conference on October 28, 2014.

Pursuant to Rule 32.1 of the Federal Rules of Criminal Procedure, Defendant Banks has been given notice of the violations, an opportunity to respond to same and to present evidence and witnesses. In the proceedings before Chief Judge Conti, he was able to cross examine all testifying witnesses. (Govt. Exs. 2, 3). In this case, Defendant Banks has knowingly and voluntarily agreed to permit the Court to rule on the record before Chief Judge Conti and to not further contest the Government's evidence of the violations. He has also been provided with counsel, although he has knowingly and voluntarily waived his right to counsel and elected to represent himself with standby counsel to assist, as needed. (Docket No. 670).

### B. Competency

Before addressing the violations, the Court first turns to the issue of Defendant Banks' competency. Due to certain disclosures Defendant Banks made during court proceedings and in civil filings concerning the Central Intelligence Agency's alleged use of "voice-to-skull" technology against him, Chief Judge Conti ordered a competency evaluation of Defendant Banks and appointed Dr. Robert Wettstein, a licensed psychiatrist in the Commonwealth of Pennsylvania, to conduct the evaluation. (Govt. Ex. 1; Govt. Ex. 2). Dr. Wettstein reviewed the relevant records of Defendant Banks' criminal case and several of his civil filings, his pertinent

medical background information, conducted an evaluation of Defendant Banks on November 15, 2013, produced a report dated November 17,[2] 2013 and provided testimony at a hearing held on November 20, 2013. (Govt. Ex. 2 at 10-11). Dr. Wettstein was accepted by Chief Judge Conti as an expert in the field of psychiatry and this Court concurs that he is an expert in this field given his qualifications, significant experience in this field and his having been accepted by numerous courts as an expert witness. (*Id.* at 9). Dr. Wettstein's opinion was that Defendant Banks suffers from a serious mental disorder, specifically, paranoid schizophrenia or psychosis not otherwise specified, but that such conditions did not render him unable to waive his right to counsel and proceed to represent himself *pro se*. (*Id.* at 11-12). Dr. Wettstein further elaborated that:

> the area of -- the area in his mind of the illness is not directly related to the present proceedings and – in other words -- and this is true in many individuals who have such a condition -- they can function in certain areas of their lives and have impairments in other areas of their lives. So there's certain preserved, intact areas of functioning that he has that aren't going to directly relate to the particular case here.

(*Id.* at 14). Defendant Banks disputed the diagnosis by Dr. Wettstein and his reliance on a Bureau of Prisons Report stating that he suffered from similar mental health impairments. (*Id.* at 12). Nevertheless, after conducting a colloquy with Defendant Banks, and in reliance on Dr. Wettstein's opinions that Defendant Banks was competent to represent himself, Chief Judge Conti determined that Defendant Banks was competent to participate meaningfully in the proceedings, to knowingly and voluntarily waive his right to counsel and to represent himself. (*Id.* at 17-28).

At the status conference/violation hearing conducted on October 28, 2014, this Court

---

[2] The Court notes that given the parties' agreement that this Court could resolve the matter on the record, Chief Judge Conti authorized the undersigned to review the sealed report of Dr. Wettstein. (Crim. No. 04-176, Docket No. 706).

4

conducted a similar colloquy with Defendant Banks. Based on his appropriate demeanor and responses to the Court's questioning, this Court independently found that Defendant Banks was competent to meaningfully participate in the supervised release proceedings and that he had knowingly and voluntarily waived the right to counsel, despite this Court's recommendation that he not do so. Defendant Banks also agreed to the appointment of standby counsel, Ms. Diane McClelland, Esquire and the Court reiterated that it had made such appointment on his behalf. Having further considered these matters in light of Dr. Wettstein's report and testimony, which the Court has now reviewed in full, the Court's rulings made on the record at the October 28, 2014 status conference/violation hearing stand.

### C. Government's Evidence

The Government presented the testimony of a number of witnesses and introduced a number of exhibits into evidence at the violation hearing conducted before Chief Judge Conti on November 20, 2013 and November 25, 2013. (Govt. Exs. 2-3). Defendant Banks was provided with notice of the hearing, and an opportunity to present evidence, but he did not present any witnesses and instead presented his case through cross-examination of the Government's witnesses. (*Id.*). The Government's witnesses included Special Agent Sean Langford of the Federal Bureau of Investigation ("FBI"); Benjamin Orrisson of the United States Probation Office; George Cole, a representative of Eureka Bank; and Adam Corcoran, III a former friend and employee of an entity Defendant Banks operated. (*Id.*). Chief Judge Conti generally found their respective testimony to be credible. (Govt. Ex. 3).

Having independently reviewed the record, this Court finds that the Government proved the following facts by a preponderance of the evidence.

Defendant Banks' date of birth, Social Security number and Commonwealth of

Pennsylvania driver's license number were established through public sources. (Govt. Ex. 2 at 36-38). While on supervised release, Defendant Banks made financial disclosures to the United States Probation Office in monthly supervision reports from June, August and September of 2013 indicating that he had limited employment, nominal income and maintained bank accounts at First Niagara and Wells Fargo which contained nominal and/or insufficient funds. (Govt. Ex. 2 at 45-50; 92-94; 96-98; 104-05). On these forms, Defendant Banks stated that he was the president of Hexagon Records. (*Id.*). In addition, Defendant Banks provided contact information to the Probation Office, including his street address, email address, cell phone and Post Office Box number. (*Id.*). On May 30, 2013, Defendant Banks rented the Post Office Box in the name of his business, Hexagon Records, and provided his Pennsylvania issued driver's license, his home address, and the same email address on the rental application. (*Id.* at 50-52).

Through additional public records, the Government showed that Defendant Banks' mother, Freddie Banks, was the owner of the residence he listed on his monthly supervision reports and her Social Security number was entered into the record. (Govt. Ex. 2 at 36-37). However, Freddie Banks passed away in 2006, seven years before the events in question. (*Id.* at 37). Postal inspection agents confirmed that Defendant Banks was the only individual to receive mail at the residence during this timeframe. (*Id.* at 38).

A search warrant was executed at the residence and among the items seized included a copy of a Pennsylvania driver's license for Adam Corcoran, III, Defendant Banks' cell phone and certain computer equipment. (Govt. Ex. 2 at 69-70). Mr. Corcoran testified that he was friendly to Defendant Banks from around 1996 or 1997 through 2002 or 2003, when they had a falling out due to a financial disagreement. (Govt. Ex. 3 at 14). Mr. Corcoran confirmed that the document seized from the residence was his Pennsylvania identification card from 1997 and that

his birthdate was accurately listed on the card. (*Id.* at 20-21). He said he did not know how his identification card came into Defendant Banks' possession, (*id.* at 21), and denied that he provided it to Defendant Banks pursuant to his employment at Hexagon Records, (*id.* at 26). Information obtained from service providers indicated that an IP address associated with internet service at the residence was registered to Defendant Banks, with the same phone number and email but a different street address from nearby East Carson Street. (Govt. Ex. 3 at 32). Sprint records also confirmed that the cell phone number provided by Defendant Banks was registered to him at the same residence. (Govt. Ex. 2 at 42-43).

During August of 2013, four financial trading accounts were opened with New Jersey-based Gain Capital through its online presence Forex.com via online applications in the names of Frederick Banks, Freddie Banks and Hexagon Records. All of the online applications were submitted to Gain Capital/Forex.com in New Jersey from the IP address associated with Defendant Banks in the Pittsburgh area. (Govt. Ex. 3 at 32).

The information provided in the application for the individual account in the name of Frederick Banks included Defendant Banks' email address, phone number, street address, Social Security number and date of birth. (*Id.* at 40-41). His employer is listed as Hexagon Records, at the same Post Office Box number and describes Frederick Banks as the president of this entity. (*Id.* at 41-42). The application discloses that Frederick Banks has an annual income of over $500,000 and a net worth of over $5,000,000.00. (*Id.* at 42). It also sets forth that Frederick Banks has over three years of stock and equity trading experience. (*Id.*).

The application for the individual account in the name of Mr. Freddie Banks included Defendant Banks' email address, residence and birthdate. (*Id.* at 51). This application lists a different phone number, and Defendant Banks' deceased mother's Social Security number as

personal information. (*Id.* at 51, 61). Mr. Freddie Banks is listed as a vice president of sales at Holcomb, located on East Carson Street, with an annual income over $500,000.00, a net worth of $5,000,000.00 and three years of stock and equity trading experience. (*Id.* at 51). The government also played a recording between an individual purporting to be Mr. Freddie Banks and a Gain Capital employee in connection with this account. (*Id.* at 57-58). Both Chief Judge Conti and the Probation Officer identified Defendant Banks as the individual speaking on the recording. (Govt. Ex. 2 at 91; 127; Govt. Ex. 3 at 81). Special Agent Langford similarly opined that he believed it was Defendant Banks' voice, although he did not have as much interaction with him as did Chief Judge Conti and the Probation Officer. (Govt. Ex. 2 at 58).

The third application for a trading account was set up as an individual account in the name of Mr. Frederick Banks. (*Id.* at 62). This application again includes Defendant Banks' address, Social Security number, birthdate, and cell phone number. (*Id.*). It also states that he is employed as an executive of Hexagon Records, with an address at the PO Box. (*Id.* at 62-63). Once again, the application states that Defendant Banks had an annual income over $500,000.00, a net worth of more than $5,000,000.00, and three years of stock and equities experience. (*Id.* at 63).

The fourth application was established as a business account in the name of HLLC purportedly by its C.E.O., Adam Corcoran. (*Id.* at 63-64). The business address provided on East Carson Street was the same address that was listed on the application for Mr. Freddie Banks' employer, Holcomb. (*Id.* at 65). This application states that HLLC has annual income over $36 million and a net worth of over $98 million. (*Id.* at 64-65). It also provides a Social Security number and date of birth for Mr. Corcoran. (*Id.* at 64). Mr. Corcoran testified that he "absolutely" did not make this application, had no knowledge of HLLC, or any of the

information set forth in the application, aside from his name and birthdate, which he acknowledged were accurate but strongly denied that he had authorized Defendant Banks to use his information. (Govt. Ex. 3 at 17-20). He further explained that the signature on the application looked like his signature but that it was forged because he did not sign the document. (*Id.*).

A bank statement purportedly from an account maintained by Eureka Bank was also submitted to Forex.com along with the application for the business trading account. (Govt. Ex. 2 at 66-67). This bank statement listed Hexagon, LLC as the account holder with the same address on East Carson Street, and indicated that the account had a balance in excess of $600,000.00 as of August 2013. (*Id.*). A representative of Eureka Bank testified that the bank's records showed that Defendant Banks had previously opened two accounts in the name of Hexagon, LLC but that both accounts were closed in June of 2004. (Govt. Ex. 3 at 6-7). The representative reviewed the alleged bank statement submitted along with the application to Forex.com and testified that it was nothing like the standard bank statements prepared by Eureka Bank and appeared fabricated. (*Id.* at 7-8, 13). He also confirmed that Hexagon, LLC did not have any open accounts at Eureka Bank as of August 30, 2013. (*Id.* at 8-10).

The evidence shows that 70 automated clearinghouse deposits totaling $315,000.00 were initiated from Defendant Banks' accounts to Gain Capital/Forex in an effort to fund the trading accounts in the names of Frederick Banks, Freddie Banks and Adam Corcoran/HLLC. (Govt. Ex. 2 at 53-55). Between August 22 and 23, 2013, there were attempts to withdraw funds from the accounts via wire transfers and two checks. (*Id.* at 55). Two of the attempted withdrawals included checks of $4,800 requested to be sent to Defendant Banks' accounts at First Niagara and American Express. (*Id.* at 56). Representatives of Gain Capital/Forex froze the trading

accounts due to the submissions of multiple incoming and outgoing wire transfers associated with the accounts. (*Id.* at 59). In a recorded call, a representative spoke with Freddie Banks – later identified as Defendant Banks – in an effort to substantiate the transfers and requested additional information concerning the accounts. (*Id.*). In response, Defendant Banks provided a document purporting to be an online screen shot from the balance information of a First Niagara account with Defendant Banks' account number, showing current and available balances of over $2,000,000.00. (*Id.* at 59-60). Information obtained from First Niagara disclosed that the account in question actually had a negative balance of -$4,621.08 as of August 22, 2013. (*Id.* at 60). Hence, the screen shot was likely fabricated as well.

Ultimately, the Gain Capital/Forex accounts remained frozen and these entities apparently did not sustain any direct financial losses from the attempts by Defendant Banks to withdraw funds from the accounts, based on the evidence before this Court.

III. LEGAL STANDARD

"'[T]here is no requirement of conviction or even indictment' to find that a defendant has violated supervised release by committing a crime." *United States v. Carter*, 730 F.3d 187, 192 (3d Cir. 2013) (quoting *United States v. Poellnitz*, 372 F.3d 562, 566 (3d Cir. 2004)). Instead, the Court may revoke a defendant's supervised release if it finds by a preponderance of the evidence that a condition of release has been violated. *See* 18 U.S.C. § 3583(e)(3).

IV. DISCUSSION

In light of the relevant standard, the Court turns to its evaluation of the evidence presented by the Government as to each of the alleged crimes and finds that both were proven by the Government by a preponderance of the evidence.

    *A. Wire Fraud*

"To prove wire fraud, the government must establish '(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of ... interstate wire communications in furtherance of the scheme.'" *United States v. Whoolery*, No. 13-4171, 2014 WL 4377669, at *3 (3d Cir. Sept. 5, 2014) (quoting *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012)).

In this Court's estimation, the evidence shows by a preponderance of the evidence that Defendant Banks knowingly and willfully participated in a scheme to defraud Gain Capital/Forex of money by making a series of material misrepresentations in the course of his submission of four applications for trading accounts, attempts to fund the accounts with fraudulent wire transfers and then immediately withdraw the funds from the accounts before the fraud could be detected. With respect to the first element, a "scheme or artifice to defraud" is achieved "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "Materiality of falsehood is an element of the federal … wire fraud … statute[]." *Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) "To be material, the statement must have a natural tendency to influence, or [be] capable of influencing, the decision making body to which it is addressed." *United States v. McBane*, 433 F.3d 344, 350 (3d Cir. 2005) (internal citations omitted). "It is also clear that a statement may be material even if no agency actually relied on the statement in making a decision." *Id.* "In other words, [...] the relevant inquiry [is] whether the falsehood was of a type that one would normally predict would influence the given decisionmaking body." *Id.* at 351. The material misrepresentations made by Defendant Banks included, among other things:

- Two applications for trading accounts to be opened in Defendant Banks' own name contain gross misstatements concerning his own financial condition (i.e., claims of an annual income in excess of $500,000 and a net worth of

> $5,000,000.00 when, in reality, as he reported to the Probation Office, he had nominal income and net worth);

- Two applications for accounts to be established in names of others and using some of their personal identifiers clearly misrepresent that Mr. Freddie Banks (the name of his deceased mother) and Adam Corcoran were the applicants, and contain similar misrepresentations regarding the financial condition of Freddie Banks and HLLC when his mother had been deceased for seven years with no income or net worth and HLLC was not a true going concern with income and net worth at the levels noted on the applications; and,

- Defendant Banks told a representative of Gain Capital/Forex in the recorded telephone call that he was Freddie Banks who made the application for the account under that name and he then provided a false statement of the amounts in the account that he, Defendant Banks, owned at First Niagara Bank when questioned about the propriety of the transactions (i.e., a statement showing in excess of $2,000,000.00 when, in reality, he had a negative balance around that time).

It is also reasonable to infer that it is more likely than not that the material misstatements set forth in the four applications, all of which were factually linked to Defendant Banks given the similarities in the information provided, such as the street address, telephone number, email address, and associated IP address, caused Gain Capital/Forex to open four trading accounts, and to accept the various wire transfers into the accounts initially. *See McBane*, 433 F.3d at 450. Thus, it is reasonable to infer, by a preponderance of the evidence, that the trading accounts were only opened by Gain Capital/Forex due to the misinformation provided by Defendant Banks, particularly, the financial information that the applicants had sufficient annual income and net worth to engage in the type of securities trading undertaken through these types of accounts.

The evidence also suffices to prove that Defendant Banks acted with intent to defraud under the preponderance standard. "To act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat. In considering whether [the

defendant] acted with an intent to defraud, [the finder of fact] may consider, among other things, whether [the defendant] acted with a desire or purpose to bring about some gain or benefit to [himself] or someone else or with a desire or purpose to cause some loss to someone." *Third Circuit Model Criminal Jury Instruction* § 6.18.1341-4. "[F]raud can be 'measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community.'" *United States v. Riley*, 621 F.3d 312, n.19 (3d Cir. 2010) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987)). Here, the evidence shows that Defendant Banks more likely than not submitted the four trading applications and the various incoming and outgoing wire transfers for the purpose of obtaining money from Gain Capital/Forex through his deceptive scheme. The evidence of Defendant Banks' intent to defraud is further bolstered by his conversation with the Gain Capital representative and his submission of fraudulent bank statements purportedly from First Niagara and Eureka Bank in an effort to substantiate the propriety of the applications he submitted. Overall, the evidence of the scheme presented by the Government shows that Defendant Banks engaged in conduct which clearly departs from fundamental honesty, fair play and candid dealings which Gain Captial/Forex expects individuals to engage in when they submit trading applications. *See Riley*, 621 F.3d at n.19.

Finally, the evidence clearly shows that the interstate wires were used as Defendant Banks submitted the four applications containing material misrepresentations to Gain Capital/Forex in New Jersey via the internet from his location in Pittsburgh, Pennsylvania. *See United States v. Williams*, 492 F. App'x 777, 778 (9th Cir. 2012) (finding email evidence sufficient to convict under wire fraud statute); *see also Andrews*, 681 F.3d at 528-29 (noting that defendant was charged with wire fraud based on email communications).

Accordingly, the Court finds that the Government has proven by a preponderance of the evidence that Defendant Banks committed the offense of wire fraud while on supervised release.

### B. *Aggravated Identity Theft*

With respect to the charge of aggravated identity theft, the Court of Appeals has held that "*"[a]n individual who 'during and in relation' to a [wire] fraud offense 'knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person' is also guilty of aggravated identity theft." *United States v. Ballard*, 551 F. App'x 33, 40 (3d Cir. 2014) *cert. denied*, 134 S. Ct. 2157, 188 L. Ed. 2d 1141 (2014) (quoting 18 U.S.C. § 1028A). Pursuant to 18 U.S.C. § 1028(d), "means of identification" is defined by statute to include "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any-- (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 18 U.S.C. § 1028(d).

As the Court has already discussed, the evidence is sufficient to find that the Government has proven by a preponderance of the evidence that Defendant Banks committed the predicate offense of wire fraud. The Court further finds that the remaining elements of the crime of aggravated identity theft have likewise been proven under this standard.

In connection with the trading account applications, Defendant Banks used the means of identification of two other individuals. To this end, he submitted the name and Social Security number of his deceased mother in connection with the application for the trading account in the name of Mr. Freddie Banks. (Govt. Ex. 2 at 51, 61). He also provided the name and birthdate of Adam Corcoran with the application for the trading account in the name of HLLC. (Govt. Ex. 3

at 17-20). The evidence further demonstrates that he knowingly provided such information to Gain Capital/Forex in connection with the applications as he was found in possession of Mr. Corcoran's Pennsylvania identification card and likely had access to his deceased mother's Social Security information due to their relationship. However, neither individual authorized Defendant Banks to use their means of identification to apply for trading accounts at Gain Capital/Forex. *See Ballard*, 551 F. App'x at 40. Accordingly, the Court holds that the Government has proven that Defendant Banks committed the offense of aggravated identity theft by a preponderance of the evidence.

### C. Conclusion

For these reasons, the Court finds that the Government has proven by a preponderance of the evidence that Defendant Banks committed the crimes of wire fraud and aggravated identity theft in violation of the conditions of his supervised release and is subject to revocation of supervised release pursuant to 18 U.S.C. § 3583(e)(3). Upon revocation, Defendant Banks is subject to a statutory maximum penalty of two years' incarceration, (*id.*), and an advisory guidelines range of 6-12 months' incarceration based on his criminal history category of II and his commission of a grade "B" violation. *See* U.S.S.G. § 7B1.4(a). This Court also retains the discretion to order the sentence to run concurrently or consecutively to the sentence imposed at Criminal No. 04-176. *See* 18 U.S.C. § 3584(a); *see also United States v. Dees*, 467 F.3d 847, 853, (3d Cir. 2006).

At the continuation of the supervised release violation hearing on October 30, 2014 at 10:30 a.m., the parties will be given an opportunity to present argument as to an appropriate sentence, including any joint recommendation, Defendant Banks will be permitted to allocute and present any evidence in mitigation of his sentence. After considering the parties' positions,

the Court will impose sentencing in this case.

*D. Other Matters*

Three other matters have been raised by Defendant Banks which are not directly related to the Court's evaluation of the evidence as to the supervised release violations. The Court now considers his requests, in turn.

Defendant Banks first moves for the return of his Ferrari Kit Car which he claims the FBI seized in connection with this case but has not returned. The Government denies that the FBI seized this particular car from Defendant Banks and points out that he received compensation for his loss of the car from an insurance company. Defendant Banks acknowledges the compensation but argues that he received far less than the Ferrari Kit car was worth.

The Court notes that Defendant Banks has repeatedly litigated this issue in his criminal and civil cases. *See e.g., United States v. Banks*, Cr. No. 04-176, 2008 WL 2944611 (W.D. Pa. Jul. 28, 2008); *Banks v. Unknown Number of U.S. Postal Inspectors*, 2013 WL 5945786 (W.D. Pa. Nov. 6, 2013); *Banks v. Dictorate, Science & Technology Center (CIA), et al.*, 2014 WL 1278097 (W.D. Pa. Mar. 27, 2014). The Court also notes that the Ferrari Kit Car is <u>not</u> the subject of the Final Order of Forfeiture issued in this case on January 9, 2008. (Docket No. 336). Further, his motion for return of the Ferrari Kit Car was denied in both this case and Criminal No. 04-176 based upon representations from the Government – in 2008 – that that the FBI opened an administrative forfeiture case against Defendant Banks but closed it without seizing the Ferrari Kit Car or ever taking possession of it. *See Banks*, 2008 WL 2944611; *see also* Docket No. 368. The Government's position remains the same today. The Court of Appeals affirmed this Court's decision denying his relief in an Opinion dated January 29, 2010 addressing in consolidated fashion a number of his appeals challenging several of this Court's

Orders.  *See United States v. Banks*, 372 F. App'x 237 (3d Cir. 2010).  As noted, Defendant Banks also admits that, consistent with Special Agent Langford's testimony in Criminal No. 04-176, he received an insurance check for his loss.  Therefore, as there is no Ferrari Kit Car in possession of the Government to return, at most, Defendant Banks is seeking financial relief which cannot be awarded through this criminal case.  Accordingly, Defendant Banks' motion for return of said property is denied.

Defendant Banks also claims that he is the subject of a warrant issued by the Foreign Intelligence Surveillance Court and requests that the Government be ordered to produce a copy of the warrant to him.  Defendant Banks believes that the FISA warrant authorizes the CIA to conduct its "voice-to-skull" operation against him.  Defendant Banks advised the Court that he filed a motion with the Foreign Intelligence Surveillance Court but has not received any response to same.  In response, Government counsel advises that it has no knowledge of a FISA warrant against Defendant Banks, and has not used any evidence obtained through a FISA warrant in his prosecution of the supervised release violations in these cases.

Here, aside from Defendant Banks' uncorroborated statements, there is no evidence before this Court that a FISA warrant actually exists.  Such warrants are by their nature secret and the Government is authorized to disclose such information to the targets or "aggrieved persons" only for limited purposes, including when information obtained via the search warrant is sought to be introduced in a criminal proceeding.  *See* 50 U.S.C. §§ 1806(c), 1825(d).  The Government has not sought to introduce any evidence into this proceeding from a FISA warrant and there is likewise no factual or legal link between the present case and any information obtained from the alleged warrant.  Accordingly, Defendant Banks' motion to compel is denied, based on the record presently before this Court.

Finally, Defendant Banks requested that the Court order the United States Marshal Service to provide him with a gratuity upon his release from custody. Neither counsel for the Government nor the Court were aware of the availability of same. Having now had the opportunity to review the relevant policies of the United States Marshal Service, § 9.15 "Release Gratuities for Federal Prisoners" and Bureau of Prisons Program Statement No. 5873.06 "Release Gratuities, Transportation, and Clothing," the Court finds that Defendant Banks' requests are administrative in nature and are not properly before the Court. In any event, given Defendant Banks' situation wherein he has been ordered in Criminal No. 04-176 to serve six months of supervised release at the Renewal Center, Inc. to commence immediately upon his release, (and which service he has begun), he does not meet the relevant criteria for a gratuity, which is authorized for the purposes of providing suitable clothing, and transportation to the inmate's destination after he is released from custody to the community. Further, Defendant Banks admitted that he had suitable clothing at the Allegheny County Jail, where he was ordered to return after the October 28, 2014 hearing, and his standby counsel also indicated a willingness to help find him clothing. Additionally, the Probation Office was ordered to facilitate his transportation from the federal courthouse to the Renewal Center upon his release from the custody of the United States Marshal Service. Accordingly, Defendant Banks' request for the Court to order the United States Marshal Service to provide him with a gratuity is denied.

V. CONCLUSION

Based on the foregoing, the Court finds that Defendant Banks has committed grade "B" violations of his supervised release and will proceed to revoke same pursuant to 18 U.S.C. § 3583(e)(3) at the continuation of the violation hearing on Thursday, October 30, 2014 at 10:30 a.m. During the hearing, the Court will hear argument and any recommendations from the

parties and the Probation Office as to an appropriate sentence in this case, permit Defendant Banks to allocute, and impose his sentence for his supervised release violations. In addition, Defendant Banks' oral motions made during the October 28, 2014 hearing are denied.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   October 29, 2014

cc/ecf: All counsel of record
U.S. Probation Office
Frederick H. Banks c/o standby counsel Diane McClelland, Esquire